976 P.2d 462

**STATE of Idaho, Plaintiff–Respondent,**

v.

**Veniamin KUZMICHEV, Defendant–Appellant.**

No. 23890.

Supreme Court of Idaho,
Boise, January 1999 Term of Court.

April 2, 1999.

Alan E. Trimming, Ada County Public Defender; August H. Cahill, Jr., Deputy Public Defender, Boise, for appellant. August H. Cahill, Jr. argued.

Hon. Alan G. Lance, Attorney General; Kenneth K. Jorgensen, Deputy Attorney General, Boise, for respondent. Kenneth K. Jorgensen argued.

SCHROEDER, Justice.

Veniamin Kuzmichev (Kuzmichev) appeals a criminal conviction of murder in the second degree. The Court affirms.

## I.

### BACKGROUND AND PRIOR PROCEEDINGS

Kuzmichev married Wanda Cowger (Victim) in May of 1995, after a short courtship. They lived together in her mobile home in Boise. She worked as a janitor three nights a week at the Idaho State Bar building in downtown Boise on Mondays, Wednesdays and Fridays. She usually arrived at work at about 5:30 p.m. on Fridays. Kuzmichev frequently assisted her in this job.

In the early morning hours of September 16, 1995, Kuzmichev made a 911 call to report that the Victim had not returned from work after she had left the night before. He apparently gave several different accounts of the time she had left for work, from as early as 4:00 p.m. to as late as 9:00 p.m. He also told the police that he did not know where she worked or how to contact her employer or family.

The Victim's family organized several efforts to canvas the places where she might be. Kuzmichev was uninvolved in these efforts and at one point stated that such efforts were "too late."

On September 21, 1995, the Victim's nude, partly decomposed body was found in the foothills on the edge of Boise. Her body had a plastic grocery bag over the head, with some blood in the bag. A brown plastic garbage bag with a yellow drawstring secured in part with duct tape was wrapped around her feet.

The body was eventually identified through the use of dental records. It was difficult to determine the cause of death, due to the decomposition, but the pathologist ultimately opined that the cause was asphyxiation, probably by strangulation or suffocation. There were two of Kuzmichev's fingerprints on the plastic bag wrapped around her legs. There was a fragment of a fingerprint, too little to identify, found on the duct tape where it was torn.

The Victim's car which had been missing was discovered in the Waremart parking lot near her house on the same day her body was found. The car had not been there a day or so previously. Tools, some religious literature and other items that the Victim kept in her trunk were not in the car. They were found near the driveway of her mobile home. There were traces of the Victim's blood in the trunk of the car. Kuzmichev's fingerprints were found on the trunk lid, and one of his prints was found on the gearshift lever in such a way as to indicate that he was the last person to drive the vehicle.

On January 4, 1996, Kuzmichev called the lead detective in the investigation to see whether he could return to Russia to visit his son. Kuzmichev then went down to the police station for an interview and asked if he

was a suspect. At the conclusion of the interview, the police arrested Kuzmichev for the murder of his wife.

After the arrest, the police circulated fliers with Kuzmichev's photograph to stores in the area, asking for information as to whether he had purchased items such as were used in the murder. An employee of a Waremart grocery store informed police that she remembered Kuzmichev buying garbage bags, duct tape and clothes line cord on the night of the Victim's disappearance. A fellow inmate in the Ada County Jail testified that Kuzmichev made several incriminating statements to him. One of those statements followed a newscast regarding the identification of Kuzmichev by the Waremart employee. According to the inmate informant, Kuzmichev said that he remembered the Waremart clerk, but that he did not use the bags or tape he bought from Waremart in the crime. Later testing confirmed that the type of duct tape sold by Waremart did not match that found on the Victim's body, although samples of duct tape found in Kuzmichev's home did. Likewise, the brown plastic bag on the Victim's legs was not of the type sold by Waremart, but was available for sale at the Shopko store across the street.

Kuzmichev moved to dismiss the case based on the evidence presented at the preliminary hearing. The motion was denied. He also moved to suppress several items of evidence, including his statements in police interviews, the "identification" by the Waremart employee and the statements made to the inmate. These motions were also denied.

During the trial the prosecutor asked the mother of the inmate informant about her belief in the testimony of her son. An objection was made and sustained, preventing the witness from answering. Kuzmichev moved for a mistrial, citing improper vouching for credibility and negative inferences from the question. He also objected to the witness's effort to imply that a defense investigator had attempted to influence her. The motion for mistrial was denied. The district judge instructed the jury to disregard the question and any implications from it. The district court also acted to cut off the remarks concerning the investigator. There was no evidence of any misconduct by the investigator.

At the end of the State's case, Kuzmichev moved for a judgment of acquittal pursuant to Idaho Criminal Rule 29. The district court granted the motion as to first degree murder, allowing the case to proceed only as to second degree murder. The defense then offered evidence, but Kuzmichev did not testify. The jury convicted him of second degree murder. The district court imposed a unified sentence of life imprisonment with a mandatory minimum term of twenty-one years.

## II.

## THE DISTRICT COURT DID NOT ERR IN ALLOWING THERESA WATSON, THE WAREMART EMPLOYEE, TO TESTIFY REGARDING HER IDENTIFICATION OF KUZMICHEV.

A Waremart employee, Theresa Watson (Watson), contacted police on January 16, 1996, after the police had distributed a photographic flyer of Kuzmichev to several local retail stores including Waremart. Watson explained that she did not make an immediate connection, but after looking at the flyer for several days, recalled the transaction that took place in September of 1995. There was no record of the transaction available from Waremart due to the passage of time. Waremart only kept such records for approximately two months. The flyer from which she identified Kuzmichev had a photo of him, stated that there was a murder investigation, specifically asking if duct tape and/or trash bags had been sold to the man in the photo on Friday, September 15, 1995, through Wednesday, September 20, 1995. The flyer also stated that the man spoke with a heavy Russian accent.

Watson later identified Kuzmichev at a six-person line-up. She had not provided the police with a physical description prior to the line-up, beyond identifying his photograph on the flyer. Subsequently, she was allowed to testify that Kuzmichev purchased duct tape, plastic garbage bags and clothesline rope from her in a transaction that she guessed

took three to five minutes. She characterized his demeanor as unfriendly.

Kuzmichev sought to exclude Watson's testimony, arguing that the flyer used by the police amounted to a one person show-up or line-up which tainted the in-court identification, violating the standards in *State v. Hoisington,* 104 Idaho 153, 657 P.2d 17 (1983).

In *Hoisington,* the Court recognized that " '[r]eliability is the linchpin in determining the admissibility of identification testimony.' " 104 Idaho at 161, 657 P.2d at 25 (quoting *Manson v. Brathwaite,* 432 U.S. 98, 114, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977)). The *Hoisington* Court also noted that " 'the due process test for suppression of an in-court identification that is allegedly tainted by an impermissibly suggestive out-of-court identification is whether the out-of-court identification was so suggestive that there is a very substantial likelihood of misidentification.' " *Id.* (quoting *State v. Crawford,* 99 Idaho 87, 103, 577 P.2d 1135, 1151 (1978)).

The central question under *Hoisington* is whether under the totality of the circumstances the identification was reliable even though the procedure was suggestive. *Id.* at 162, 657 P.2d at 26. *Hoisington* lists five factors to be considered in making such a determination:

(1) the opportunity of the witness to view the criminal at the time of the crime,

(2) the witness's degree of attention,

(3) the accuracy of his prior description of the criminal,

(4) the level of certainty demonstrated at the identification, and

(5) the length of time between the crime and the identification.

*Id.* (citations omitted).

The trial court determined the flyer to be inherently suggestive. Kuzmichev then maintains that Watson's testimony fails the five factor test: (1) the transaction took no more than three to five minutes and there was limited eye contact between Watson and the other person; (2) there was no significant reason for Watson to have paid special attention to the incident—no crime was · taking place; (3) Watson gave no prior description; (4) although she was certain of her identifica-

tion, she spent considerable time examining the flyer with Kuzmichev's picture on it; and (5) while only three and one-half months passed between the alleged transaction and viewing the flyer, which is less than five months in *Hoisington,* and the seven months in *Neil v. Biggers,* 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972), there was no reason for her to even recall the incident. Taking these facts into account, Kuzmichev argues Watson's testimony should not have been admitted.

The State maintains that Kuzmichev has failed to demonstrate that due process was implicated by admission of Watson's testimony. She did not identify Kuzmichev as perpetrating any crime and was not a victim or eyewitness to a crime. The State argues that there was no overreaching or misconduct by the police and, therefore, Kuzmichev has failed to establish that any due process right was implicated in admission of the testimony.

Watson was not called to testify that Kuzmichev purchased the bags or duct tape for use in the crime. The duct tape and plastic bag found on the Victim's body were not purchased at Waremart. The testimony that Watson identified Kuzmichev as being in Waremart that morning was offered to bolster the testimony of Jason Akin, the inmate informant at the jail with Kuzmichev. Akin testified that Kuzmichev made admissions of the killing. One of the admissions was that, after seeing a news story that Watson could identify him, Kuzmichev stated that he remembered Watson, but he did not buy the items from Waremart for the crime. Arguably, Watson's testimony gave credence to Akin's testimony.

### A. Standard of Review

When considering an appeal from the denial of a motion to suppress, this Court "will not overturn the trial court's factual findings unless they are clearly erroneous. However, the application of constitutional standards to the facts found by the district court is given free review." *State v. Bush,* 131 Idaho 22, 28, 951 P.2d 1249, 1255 (1997).

### B. Analysis

▇ There may be merit to the State's position that due process concerns are not

applicable to the witness identification in this case. However, the issue was submitted to the district court and argued by both sides on the basis of the *Hoisington* analysis, and this Court will evaluate the question as framed in the district court. After finding that the flyer distributed by the police was suggestive, the district court made the following findings:

> In my view of the totality of the circumstances, the aspects of the reliability of Ms. Watson's identification about regard to the defendant outweigh any suggestiveness that may have been present in the identification procedures employed by the police.

> I have reviewed the testimony. She did have ample opportunity to view the defendant in a nonthreatening, nonstressful situation. It took place, what, four months after the incident. She relates her degree of attention, her level of certainty seems to be relatively high, the accuracy of her description is complemented by the circumstances of her identification, and I also throw into this continuum other aspects of her capacity to make that identification. There are no real cross-racial or ethnic factors that might influence her identification. They weren't talking anyway. Russianness didn't enter into it. She was not under any stress. She identified him again at the lineup....

> Period of time is not excessive. By her own testimony, she wasn't weighted down with other views of this defendant through the media or other police intervention. She seems to feel relatively certain on her identification, and that is, in fact, the product of her own recollection.

The district court's findings are not clearly erroneous. Based upon those findings, the identification was sufficiently reliable to present to the jury for its evaluation as to the weight, if any, it would give the testimony.

## III.

## THE DISTRICT COURT DID NOT ERR IN DENYING KUZMICHEV'S MOTION TO SUPPRESS JASON AKIN'S TESTIMONY.

Kuzmichev argues that Akin's testimony should have been suppressed because Akin was acting as an agent of the police and unconstitutionally interrogated Kuzmichev, who was represented by counsel, in order to obtain his confession. The proper framework in which to evaluate Kuzmichev's claim is set forth in *State v. Fields*, 127 Idaho 904, 910, 908 P.2d 1211, 1217 (1995):

> The Sixth Amendment to the United States Constitution and Article I, Section 13 of the Idaho Constitution clearly bar admission of statements deliberately elicited by governmental agents from an incarcerated defendant who is represented by counsel.... However, this prohibition does not require that testimony be excluded where inmate informants have not made any affirmative effort to elicit statements from the defendant or initiated conversations about the alleged crime. In order to establish that he was subjected to an unconstitutional interrogation, [the defendant] must " 'demonstrate that the police and their informant[s] took some action, beyond merely listening, that was designed deliberately to elicit incriminating remarks.' " [*State v.*] *Fain*, 116 Idaho [82,] 85, 774 P.2d [252,] 255 (*quoting* [sic] *Kuhlmann v. Wilson*, 477 U.S. 436, 459, 106 S.Ct. 2616, 2630, 91 L.Ed.2d 364 (1986)).

The inquiry into such possible Sixth Amendment violations requires that this Court determine whether (1) the inmates were acting as agents of the police, and (2) the informants affirmatively and deliberately elicited the incriminating statements.

The district court found that there was "no evidence of agency whatsoever.... [T]here is simply nothing to show that Akin or anyone else was acting at the behest of or an agent for the detective under the facts that I see." The facts in the record support the district court's conclusion.

At the suppression hearing, Detective Smith testified that his first meeting with Akin was at the Idaho State Penitentiary. This meeting was well after the admissions by Kuzmichev which had been made at the Ada County Jail. Akin was in the Ada County Jail from December 1995 through March

1996 on a probation violation. He arrived at the prison on April 2, 1996. It was only after he was in prison—after he had already heard Kuzmichev's admission—that he met with Detective Smith. This case is similar to *Fields* in which three inmate witnesses testified for the prosecution about statements that Fields had made. One of the inmates, Acheson, apparently had no contact with the police until after Fields had made statements about which he testified. 127 Idaho at 910, 908 P.2d at 1217. The court concluded:

> Absent any communication between Acheson and the police prior to Fields' statements, Acheson could not be acting as a police agent. Therefore, Acheson was not acting as a police agent and neither the United States Constitution nor the Idaho Constitution require suppression of his testimony.

*Id.* (citation omitted). In this case, if Akin had no relevant contact with the police before Kuzmichev made his admissions, Akin was not acting as an agent of the police and his testimony was not suppressible.

Notwithstanding the fact that Akin heard Kuzmichev's admissions prior to meeting with Detective Smith, Kuzmichev maintains that Akin was an agent of the police. Kuzmichev attempts to link another inmate, Craig Harris (Harris), who was an agent of the police, with Akin and thus make Akin an agent as well. Harris told Detective Smith that he should talk with Akin, presumably because he had some information about Kuzmichev. However, Akin testified that he and Harris never talked to each other about Kuzmichev. Kuzmichev takes issue with this denial given the fact that Detective Smith somehow knew that he should go see Akin. Detective Smith had a conversation with Harris that the detective related as follows:

> I asked him if Mr. Kuzmichev was talking to him, Mr. X [Harris], and he said no. I asked him if there was anyone that he could lead me to who he knew Mr. Kuzmichev was talking with, and he stated that he was close and played chess and ate with Mr. Akin and that Mr. X said Jason Akin had told him personally that Mr. Kuzmichev told Akin that he had killed his wife.

Kuzmichev interprets this to mean that Akin lied. It is also possible that Harris embellished his story. Whatever the particular facts, there is no evidence that Harris asked Akin to obtain admissions from Kuzmichev. The district court's determination that Akin was not an agent of the police is not clearly erroneous.

## IV.

## THE DISTRICT COURT DID NOT ERR IN DENYING KUZMICHEV'S MOTION TO SUPPRESS HIS STATEMENTS TO THE POLICE.

Kuzmichev moved to suppress statements he made to the police when he was questioned on January 4, 1996. Kuzmichev cited a number of factors in support of his claim that his statements were not free and voluntary: (1) the contact took place at police facilities and in a detective room; (2) the police viewed him as a suspect in the homicide investigation; (3) it is apparent that the police had no intention of allowing him to leave the police facility as evidenced by their subsequent arrest of him; (4) no new evidence was available to the police that had not previously been available other than his request for permission to potentially visit his son in Russia; (5) more than one officer participated in the interrogation creating a coercive atmosphere; (6) there was no interpreter; (7) the overall circumstances of the contact demonstrate that he was in fact in custody although not formally arrested until later in the interrogation, and the police's purpose was to elicit incriminating statements from him, which far exceeded the scope and purpose of his initial contact on that date; and (8) he received no advice of his *"Miranda"* protections and was not represented by counsel.

### A. Standard of Review

■ The determination of whether police were required to provide *Miranda* warnings is a mixed one of law and fact. The trial court's findings of fact underlying the totality of the circumstances are reviewed for clear error, but application of constitutional standards to those facts is given free review.

*State v. Birkla*, 126 Idaho 498, 501, 887 P.2d 43, 46 (Ct.App.1994).

### B. Analysis

Kuzmichev was a suspect in the case when the interview took place, and the interview was conducted in a small room. The purpose of the questioning was to elicit incriminating statements. Kuzmichev ultimately invoked his right to an attorney, but the police continued to talk to him intending to elicit incriminating statements.

*Miranda* warnings must be given to a suspect who is subject to custodial interrogation. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The United States Supreme Court explained what it means to be in "custody" for purposes of the *Miranda* requirement in *California v. Beheler*, 463 U.S. 1121, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983), holding that "the ultimate inquiry is simply whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *Id.* at 1125, 103 S.Ct. 3517. Moreover, this standard is an objective test. *Berkemer v. McCarty*, 468 U.S. 420, 442, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984). "Under *Berkemer*, the question is *not* whether a reasonable person would believe he was not free to leave, but rather whether such a person would believe he was in police custody of the degree associated with a formal arrest." 1 LaFave & Israel, Criminal Procedure § 6.6, at 105 (Supp.1991) (construing *Berkemer*). This objective standard is applied by looking at the "totality of all the circumstances" surrounding the questioning. *Birkla*, 126 Idaho at 501, 887 P.2d at 46 (quoting *State v. Medrano*, 123 Idaho 114, 117–18, 844 P.2d 1364, 1367–68 (Ct.App.1992)).

■ The district court reviewed the videotaped interview and made the following determinations:

> [T]he question for purposes of [the] constitution is the defendant in custody such that he needs to be Mirandized, which he clearly was not, and the answer in this case is clearly, no. He was not in custody in any sense of the word up until the very end. This contact was initiated by the defendant himself, not the police. He himself drove to the annex unsolicited in an attempt to notify or ask permission, "Can I leave for Russia?" It has nothing to do with the in-custodial type of indicia that *Miranda* was designed to protect. The defendant was not handcuffed. He is in street clothing. The meeting is reasonably cordial up to a point. He even asks, "Am I a suspect; can I go to mother Russia to visit my son?"
>
> The court is also quite impressed with his ability to understand English and communicate in English. Obviously, he has a thick Russian accent, but for all respects, he carries on a very healthy conversation in English. He is understood, and it's obvious he understands what's going on. He is there in [an] apparent spirit of cooperation, he is comfortable, and the bottom line is everything he says is exculpatory. There is no confession, there is no admission. The only thing that's [presented] is the police diatribe at the end where they vouch forth their theories of the case, and it is that which is totally inadmissible.
>
> . . .
>
> But from a legal point of view, this case in no way implicates the custodial interrogation that the prophylactic rule of *Miranda* was set up for.

A review of the record, including a review of the videotaped interview, supports the district court's findings and conclusion.

Kuzmichev initiated the contact with the police and drove to the police annex in order to ascertain whether he could visit his son in Moscow, Russia. He was not handcuffed nor was his freedom to leave restricted until he was arrested. In the early part of the interview he was told he was free to travel, though this changed later. Kuzmichev appears to have a sufficient grasp of the English language to ask and answer questions appropriately. The interview did become confrontive and hostile after some time had passed, but the district court's determination that under the totality of the circumstances Kuzmichev was not in custody is not clearly erroneous. It should be noted that the district court did indicate it would suppress statements made by Kuzmichev after he in-

voked his right to counsel which was ignored by the police. Ultimately, the defense elected to have that portion of the tape shown also since there were no admissions and it was indicative of the disregard of his right to counsel by the police.

 Notwithstanding the fact that the interview was non-custodial, admissions made by a defendant may be rendered inadmissible if the admissions were not voluntary. This Court addressed the issue of voluntariness of admissions in a non-custodial situation in *State v. Troy*, 124 Idaho 211, 858 P.2d 750 (1993). Kuzmichev made no admissions in the interview, but the Court will evaluate the voluntariness of any statements made. "In *Troy*, this Court adopted the test of examining the 'totality of the circumstances' of the questioning and then determining whether the defendant's will was overborne." *State v. Loosli*, 130 Idaho 398, 400, 941 P.2d 1299, 1301 (1997) (construing *Troy*, 124 Idaho at 214, 858 P.2d at 753).

The *Troy* court explained:

In determining the voluntariness of a confession, a court must look to the characteristics of the accused and the details of the interrogation, including the following:

1. Whether *Miranda* warnings were given;

2. The youth of the accused;

3. The accused's level of education or low intelligence;

4. The length of the detention;

5. The repeated and prolonged nature of the questioning; and

6. Deprivation of food or sleep.

*Troy*, 124 Idaho at 214, 858 P.2d at 753 (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 226, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973)).

Many of the facts that were used in deciding whether the interview was custodial or not are relevant to evaluating the voluntariness of Kuzmichev's statements. He went to the police annex voluntarily; he could speak and understand the English language; he was an adult; and, the interview lasted a couple of hours. The district court's deter-

mination that the statements were voluntary is not clearly erroneous.

## V.

**THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION BY NOT GRANTING KUZMICHEV'S MOTION TO DISMISS THE INFORMATION DUE TO A LACK OF EVIDENCE TO SUPPORT PROBABLE CAUSE AT THE PRELIMINARY HEARING.**

 Kuzmichev maintains that the district court abused its discretion by not granting his motion to dismiss because there was insufficient evidence to support a finding of probable cause at the preliminary hearing. However, this Court has held that if "at a fair trial the accused is found guilty upon sufficient evidence to sustain a verdict, the judgment will not be overturned for defects in proof at the preliminary hearing." *State v. Streeper*, 113 Idaho 662, 664–65, 747 P.2d 71, 72–73 (1987). This Court will not consider the adequacy of the evidence submitted at the preliminary hearing.

## VI.

**THE DISTRICT COURT DID NOT ERR IN DENYING KUZMICHEV'S MOTION FOR MISTRIAL.**

### A. Standard of Review

"Whether a trial court should grant a mistrial is a matter of discretion. In the absence of an abuse of discretion, [this Court] will not overturn the trial court's denial of a mistrial." *State v. Araiza*, 124 Idaho 82, 94, 856 P.2d 872, 884 (1993).

### B. Analysis

Kuzmichev argues that the district court erred in not granting his motion for a mistrial because: (1) the State attempted to get a witness to improperly vouch for the credibility of another witness; and (2) the same witness testified in such a way that the jury could have inferred that the defense attorneys tried to improperly influence her. The prosecutor asked Akin's mother if she be-

lieved her son. The defense objected. The district court sustained the objection. The question was never answered. The district judge chastised the prosecutor and instructed the jury on the impropriety of the question. The question should not have been asked, as the prosecutor acknowledged, but in the context of the trial the district court did not abuse its discretion in denying the motion for mistrial.

■ The same witness attempted to testify in a manner suggesting a defense investigator intimidated or attempted to intimidate her. There was no basis for the suggestion, and the district court cut the testimony short. Again, there was no abuse of discretion in denying the motion for mistrial.

## VII.

## THE DISTRICT COURT DID NOT ERR IN DENYING KUZMICHEV'S MOTION FOR A JUDGMENT OF ACQUITTAL.

Kuzmichev claims that the evidence is insufficient to support the verdict and that the trial court erred in denying his motion for judgment of acquittal. Both arguments rest on the sufficiency of the evidence to support the charge and/or the conviction of second degree murder.

### A. Standard of Review

In reviewing a motion for judgment of acquittal which has been denied and the defendant stands convicted, all reasonable inferences on appeal are taken in favor of the prosecution. Further, review of a denial of a motion for judgment of acquittal requires the appellate court to independently consider the evidence in the record, and determine whether a reasonable mind could conclude that the defendant's guilt as to such material evidence of the offense was proven beyond a reasonable doubt. *State v. Grube*, 126 Idaho 377, 386, 883 P.2d 1069, 1077 (1994) (citations omitted). Likewise, when the defendant stands convicted and the Court reviews whether there is sufficient evidence to support the verdict " 'the evidence is viewed in the light most favorable to the prosecution and the reviewing court is precluded from substituting its judgment for

that of the jury as to the credibility of witnesses, the weight of the evidence and the reasonable inferences to be drawn from the evidence.' " *State v. Allen*, 129 Idaho 556, 558, 929 P.2d 118, 120 (1996) (quoting *State v. Gardiner*, 127 Idaho 156, 163, 898 P.2d 615, 622 (Ct.App.1995)). The "jury's verdict will not be set aside if there is substantial evidence upon which a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* Moreover, " '[w]here there is competent evidence to sustain the verdict, this court will not reweigh that evidence.' " *Id.* (quoting *State v. Filson*, 101 Idaho 381, 386, 613 P.2d 938, 943 (1980)).

### B. Analysis

Upon a motion by Kuzmichev for judgment of acquittal, the district court found that the evidence did not support a finding of premeditation. Therefore, the jury could only find murder in the second degree. Murder is defined as the "the unlawful killing of a human being with malice aforethought." I.C. § 18–4001. Malice may be express or implied. I.C. § 18–4002. Murder is in the second degree unless it falls within one of the areas specified by statute, such as premeditated murder. I.C. § 18–4003(g).

■ Although the district court found insufficient evidence to support first degree murder, it stated:

It is really beyond any dispute that the victim in this case was killed, and the likelihood that it was through strangulation of some form, asphyxiation, whatever you want to call it, is most overwhelming. The body is dumped and left to rot—off of Bogus Basin.

There was a great deal of evidence of premeditation and deliberation as to the disposal of the body.... Very carefully calculated in terms of disposing of the decedent's remains. In terms of the evidence, there is sufficient evidence to link the defendant with the disposal of the body, to the fingerprints.

The autopsy reveals no obvious signs of trauma, bullet wound, knife wound, something of that nature. Circumstances are

such as to show an unlawful killing of our hapless victim, Wanda Kuzmichev. The state also has wrung out a scenario of circumstances which questions the—the disappearance of the defendant [sic] from the defendant's point of view, and I'm looking at it, obviously, from the state's best perspective, as I must.

The testimony of Mr. Akin, if believed and to what extent, cuts both ways, although it is based upon the hearsay admissions allegedly that the defendant made to him while in the jail, but if believed to the full extent, would cut against the grain of, certainly, premeditation and deliberation and may be even stronger as to—in the same vein as to murder and might get down to something else, but that's a question for the jury to, obviously, wrestle with.

Kuzmichev argues that there is insufficient evidence to support second degree murder. Instead, Akin's testimony, if believed, supports only a heat of passion killing which would be manslaughter. As the district court notes, however, the Victim in all likelihood was killed through some form of strangulation or asphyxiation. There were ligature marks on her neck and a plastic grocery bag pulled and tied over her head. The jury could have reasonably concluded that this evidence represented the requisite malice aforethought to find Kuzmichev guilty of second degree murder.

## VIII.

## THE SENTENCE IMPOSED BY THE DISTRICT COURT WAS NOT EXCESSIVE AND UNREASONABLE UNDER THE CIRCUMSTANCES OF THIS CASE.

### A. Standard of Review

 Sentencing is a matter for the trial court's discretion. *State v. McAway,* 127 Idaho 54, 61, 896 P.2d 962, 969 (1995). So long as the sentence is within the statutory limits, the appellant must show that the trial court clearly abused its discretion when imposing the sentence. *See id.* This Court will set aside the sentence only where reasonable minds could not differ as to the excessiveness of the sentence. *State v.*

*Broadhead,* 120 Idaho 141, 145, 814 P.2d 401, 405 (1991), *overruled on other grounds by State v. Brown,* 121 Idaho 385, 825 P.2d 482 (1992); *State v. Cotton,* 100 Idaho 573, 577, 602 P.2d 71, 75 (1979). To prevail, the appellant must establish that, under no reasonable view of the facts, the sentence was excessive in light of the objectives of criminal punishment—"(1) protection of society; (2) deterrence of the individual and the public generally; (3) the possibility of rehabilitation; and (4) punishment or retribution for wrong doing." *State v. Wolfe,* 99 Idaho 382, 384, 582 P.2d 728, 730 (1978).

Kuzmichev was sentenced to life imprisonment with a minimum term of confinement of twenty-one years during which he cannot be paroled. The sentence is within the statutory maximum. Kuzmichev could have received a life sentence without parole at anytime. I.C. § 18-4004. This Court will not disturb the sentence unless the record indicates the district court abused its discretion. *McAway,* 127 Idaho at 61, 896 P.2d at 969.

 In sentencing Kuzmichev the district court remarked:

[I]t is this court's heavy duty to impose sentence. The jury finds you guilty and so does the court. I am not sentencing you as some innocent victim but as a person who refuses to acknowledge guilt. That is the state of affairs and focus of this case, and I abide by that as the jury decision and sentence you accordingly. My primary goals are punishment, retribution, protection of society in your unwillingness to acknowledge not the slightest responsibility whatsoever for this death. 

It is clear that the district court considered the sentence it imposed in light of the four enumerated objectives of sentencing, but it focused mainly on retribution. This was not an abuse of discretion. "A sentence need not serve all of [the] goals; in appropriate circumstances, one may be sufficient." *Simons v. State,* 116 Idaho 69, 77, 773 P.2d 1156, 1164 (Ct.App.1989). This is such a case.

Kuzmichev does not have a violent or felonious past, but his act of second degree murder is one of the most serious offenses that a person can commit. "The seriousness

of the offense mandates a punishment in the form of a substantial prison sentence. A substantial sentence reflects society's condemnation of the defendant's conduct, deters other members of society from engaging in similar conduct, and protects society from future crime." *State v. Hooper,* 119 Idaho 606, 609, 809 P.2d 467, 470 (1991). The district court did not abuse its discretion in sentencing Kuzmichev.

## IX.

## CONCLUSION

The judgment of conviction and the sentence imposed by the district court is affirmed.

Chief Justice TROUT and Justices SILAK, WALTERS and KIDWELL CONCUR.